In re Raye Nile BYRD, D.D.S., Debtor.

WALTER E. HELLER & COMPANY, Plaintiff,

v.

Raye Nile BYRD, D.D.S. and Mary Elizabeth Moreland Byrd, Defendants.

Bankruptcy No. 3–82–01126.
Adv. No. 3–83–0865.

United States Bankruptcy Court, E.D. Tennessee.

June 21, 1984.

Stophel, Caldwell & Heggie, P.C., James R. McKoon, Chattanooga, Tenn., for plaintiff.

Goodman & Cannon, Daniel J. Goodman, Knoxville, Tenn., for defendants.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

This case involves the dischargeability of a claim based on the debtor's personal guaranty of a corporate debt for the lease of a computer. Plaintiff lessor asserts its claim is nondischargeable because the debtor obtained the lease through the use of a materially false personal financial statement, 11 U.S.C.A. § 523(a)(2)(B) (1979). Although his financial statement is irrefragably false, the debtor contends his liability is nonetheless dischargeable because plaintiff's reliance thereon was not reasonable. Also, the debtor denies he intended to deceive plaintiff through the use of his financial statement.

### I

The debtor has been engaged in the practice of dentistry for more than thirty (30) years. For several years he has conducted his private practice through a corporation, Raye N. Byrd, Jr., D.D.S., Inc.

On July 23, 1979, Professional Dental Services, P.C. (FDS) was incorporated, under the laws of Tennessee, at the instance of the debtor. The concept behind the formation of PDS was to provide affordable dental care at hours convenient to the public, maximizing the use of the PDS facility by remaining open longer hours, with an expanded staff. Debtor was the president and sole shareholder, initially, of PDS.[1] However, he had an agreement to share fifty (50) percent of the profits from PDS with Oscar Hermann, a dental technician. Hermann, the treasurer of PDS, owned the building in which PDS opened its first office in September 1979. The capital for the PDS start-up expenses consisted primarily of a $120,000.00 loan, personally guaranteed by the debtor, from Valley Fidelity Bank. Debtor rendered administrative services to PDS; he also continued his private practice.

Less than a year after PDS opened its first office, its business manager, Ted Delacourt, suggested to the debtor that PDS obtain a computer. After numerous discussions involving the debtor, Delacourt, and Gerald Nichols, the owner of Computerized Business Systems (CBS), Nichols recommended that PDS procure a Wang computer. The debtor accepted Nichols' recommendation. Assuming his seller, CBS, would arrange financing, debtor was quite surprised when payment in full was demanded upon delivery. Since he was not prepared to purchase the Wang computer on a cash basis, debtor told the delivery personnel not to unpack the computer equipment. When his seller suggested that he simply borrow the purchase money from his bank, debtor protested that he did not have time to arrange for the financing. According to the debtor's deposition testimony he told his seller, "You go to the bank, and you get the stuff ready, and [then] I'll go up to the bank with you...."[2] (Apparently both Delacourt and Nichols, who later performed accounting services for PDS, had unrestricted access to the financial records of PDS.) The debtor's bank declined to finance the purchase because it did not consider the collateral appropriate for the loan sought.

Before or about the time the debtor's bank declined to finance the purchase, either Delacourt or Nichols suggested to the debtor that PDS consider leasing the computer. Although not opposed to leasing,

---

1. The issuance of PDS stock to other shareholders is irrelevant in this case.

2. Deposition of Raye Nile Byrd at 30.

the debtor was apparently indifferent to whether financing permitting PDS to retain and begin to use the computer could be arranged:

> At that time in space [after delivery], as far as I was concerned, the computer could be sent back. We could have lived without it, and I certainly didn't have time to go around and try and find financing for it. I felt strongly that that wasn't my problem, that that was the vendor's problem, because that had always been the vendor's problem when I had bought dental equipment.... [3]

Delacourt, acting within the scope of his authority as the business manager, discussed obtaining a computer lease package for PDS with John Fine, a lease broker (a middle man who arranges financing to facilitate leasing).[4] Fine contacted Aaron Knight, a second lease broker, who informed him that certain financial information would be necessary. Principally from Delacourt, Fine obtained, and delivered to Knight, the necessary information, including the debtor's personal financial statement as of May 1, 1980.[5] The debtor had given Delacourt access to this financial statement. In turn Knight prepared and forwarded to plaintiff[6] a lease application, dated September 24, 1980, on behalf of PDS. Documents submitted in conjunction with the lease application, in addition to the debtor's personal financial statement reflecting a net worth of $1,165,372.00 as of May 1, 1980, included: (1) an income statement of PDS for the period ending July 31, 1980; (2) copies of PDS bank statements; and (3) two graphs depicting PDS revenue

from its inception in September 1979 through August 1980. After receipt and review of these documents, plaintiff requested copies of federal income tax returns for Raye N. Byrd, Jr., D.D.S., Inc.[7] Copies of the corporate tax returns for 1977 and 1978 were duly forwarded.[8]

Approving the PDS lease application, plaintiff agreed to purchase from CBS, and concomitantly lease to PDS, the previously delivered Wang computer and accessories. On October 14, 1980, the debtor executed both a lease agreement on behalf of PDS and his personal guaranty of the lease indebtedness. The lease provides for monthly payments of $1,726.00 for a term of seven (7) years.

On March 18, 1982, plaintiff declared PDS in default under the lease due to a $13,721.25 arrearage. (PDS had previously requested that plaintiff pick up the computer.) Both PDS and the debtor were notified in writing that plaintiff had elected to accelerate the entire balance due, $129,462.79, under the lease agreement. However, four months later, on July 19, 1982, when PDS filed its chapter 11 bankruptcy petition the computer had not been repossessed. An order permitting rejection of the lease and abandonment of the computer equipment by PDS, as debtor in possession, was entered on October 7, 1982. After repossessing and selling the computer and accessories, plaintiff filed a deficiency claim for $114,006.70 in the PDS bankruptcy proceeding. The PDS objection to this claim was dismissed with prejudice on June 28, 1983, when an agreed order was en-

---

3. Deposition of Raye Nile Byrd at 34.

4. It is unclear whether Delacourt's initial discussion with Fine about leasing preceded or followed the declination of the debtor's bank to provide a purchase money loan.

5. The statement, though not signed by her, actually purports to be the financial statement of both the debtor and his wife. The statement does not reflect that the debtor's wife solely owned any of the assets reported.

6. The lease application was actually forwarded to Chandler Leasing Corporation, then a subsidiary of plaintiff Walter E. Heller & Company.

Chandler Leasing was merged with plaintiff Heller effective December 31, 1980.

7. The request for these additional documents, transmitted to plaintiff by Aaron Knight, came from Bill Dowland, an account representative with plaintiff.

8. Since the taxable year for "Raye N. Byrd, Jr., DDS, Inc." closed annually on August 31st, the 1978 corporate return covered the period between September 1, 1978, and August 31, 1979.

tered granting plaintiff an unsecured claim for $114,006.70 against the PDS estate.

On July 30, 1982, less than two weeks after the PDS bankruptcy filing, the debtor and his wife filed a joint chapter 11 bankruptcy petition. They were unable to obtain confirmation of a plan of reorganization.

An order for relief under chapter 7 has been entered as to the debtor.[9] Based on the debtor's personal guaranty of the PDS computer lease indebtedness, plaintiff filed an unsecured claim in the amount of $114,006.70 against the debtor's estate. Plaintiff's complaint asserting nondischargeability of its claim, pursuant to Code § 523(a)(2)(B), was filed on October 13, 1983.[10]

## II

■ Section 523 of Title 11 of the United States Code enacts in relevant part:

(a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

.   .   .   .   .

(2) for obtaining money, property, services ... by—

.   .   .   .   .

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive....

11 U.S.C.A. § 523(a)(2) (1979).

The burden of proof with respect to each element necessary to establish an exception

from discharge rests upon the creditor. Furthermore, exceptions to discharge are strictly construed. *Gleason v. Thaw*, 236 U.S. 558, 562, 35 S.Ct. 287, 289, 59 L.Ed. 717 (1915).

Because the proof conclusively establishes that the debtor's May 1, 1980, personal financial statement is materially false, the critical determinations pertain to debtor's intent and the reasonableness of plaintiff's reliance upon the financial statement.

The debtor's financial statement as of May 1, 1980, reflects the following assets:

| | |
|---|---|
| Cash | $ 2,800 |
| Stock and Securities | 1,000,000 |
| Real Estate Registered in Own Name | 122,000 |
| Automobiles Registered in Own Name | 14,000 |
| Other Assets—Personal Effects | 110,000 |
| Total Assets | $1,248,000 |

Also, debtor's salary, qualified by his typewritten addition "estimated annualy" (sic), was reportedly $180,000.00.

The statement further reflects that the debtor's total liabilities were only $83,428.00, consisting of a $56,000.00 mortgage payable on real estate and a $27,428.00 unsecured note. Significantly, the section of the statement entitled "Contingent Liabilities" recites:

### CONTINGENT LIABILITIES

| | |
|---|---|
| As endorser or co-maker | $ NO |
| On leases or contracts | $ NO |
| Legal claims | $ NO |
| Provisions for Federal Income Taxes W-2 | $ |
| Other special debt | $ NO |

---

9. An order vacating the order for relief as to the debtor's wife and dismissing her bankruptcy case was entered on November 29, 1983. Though no order has heretofore been entered, it was announced from the bench on November 15, 1983, that the motion to dismiss the debtor's wife from this adversary proceeding was granted. She did not guarantee payment of the indebtedness at issue.

10. The debtor filed a counterclaim, asserting that the computer equipment leased from plaintiff was defective, on the date of the pretrial conference. On February 2, 1984, the court entered an order providing for bifurcation of trial of the plaintiff's cause and the debtor's counterclaim.

However, the $120,000.00 PDS start-up loan (from Valley Fidelity Bank) personally guaranteed by the debtor, was admittedly still due and owing in May 1980. Additionally, the following obligations were omitted from the debtor's financial statement, despite his guaranty or agreement to pay in the first instance (by signing notes without indicating his representative capacity):

| Date Obligation Incurred | Obligee | Original Amount of Obligation or Limit of Guaranty |
| --- | --- | --- |
| 8/31/79 | Park Nat'l Bank | $80,000.00[11] |
| 11/15/79 | Studebaker-Worthington | 8,724.60 |
| 3/7/80 | Corine Winters | 25,000.00 |
| 3/19/80 | Central Penn Nat'l Bank | 61,136.63 |

Furthermore, the debtor's schedule of liabilities, filed July 30, 1982, reflects two unsecured claims in the amount of $25,000.00 and $39,654.20, respectively held by McKinley Braden and Dr. Roy Hall. According to the debtor's sworn schedules, each of these claims is based on a loan indebtedness incurred in March 1980.[12]

The debtor testified that he thought all these omitted obligations were debts of PDS. However, some of the notes evidencing these omitted liabilities were signed in the debtor's individual capacity. Others were undeniably guaranteed by the debtor, whose inattentiveness to financial matters is exemplified by his own testimony:

Q   Did you know on May first [1], 1980 what debts you had personally guaranteed or not?

A   It wasn't important—I—at that time to me. I understand the importance of it more now.[13]

The debtor's representations regarding his assets are also materially false. On May 1, 1980, the debtor owned the outstanding stock of both PDS and Raye N. Byrd, Jr., D.D.S., Inc. However, as previously noted, he was entitled to only fifty (50) percent of the PDS profits. He represented the value of his one-half (½) interest in PDS, a ten-month old corporation in which only approximately $30,000.00 in unborrowed funds was initially invested,[14] as $900,000.00. This representation of value is grossly inflated. PDS had lost money each month since its inception, in September 1979, until March 1980, when it experienced a net profit of approximately $25,000.00. According to an unaudited balance sheet prepared some three months after the debtor executed his personal financial statement, total current liabilities of PDS exceeded its total current assets by more than 250%.[15] Hermann, the PDS treasurer, testified that the PDS stock was worthless in May 1980, and "anybody that would have bought it would have been a fool."[16] Furthermore, the sworn schedules of assets and liabilities of PDS, filed with its bankruptcy petition on July 19, 1982, reflect that liabilities exceeded assets by the amount of $945,539.82.

Debtor's explanation of his representation is simply that it was *his opinion* that

11. The debtor unconditionally guaranteed an $80,000.00 demand note, dated August 24, 1979, from PDS to Park National Bank. This note was renewed on March 24, 1980, for the amount of $137,955.72, and a maturity date of April 20, 1987, was established. Debtor's guaranty apparently was limited to $80,000.00.

12. The time for filing proofs of claim in the debtor's case has expired. Neither McKinley Braden nor Dr. Hall filed a proof of claim based on a March 1980 loan extended to or guaranteed by the debtor. Braden, however, has filed an unsecured claim for $25,000.00, plus interest, based on a note for that amount dated December 11, 1981. The note he holds is signed by the

debtor and his wife in their individual capacities.

13. Transcript of Testimony at 222.

14. Approximately eighty (80) percent of the PDS start-up expenses were paid with the $120,000.00 loan from Valley Fidelity Bank.

15. As of July 31, 1980, total current liabilities were $487,064.47; total current assets were valued at only $183,429.59. (The value of the current assets does not include the value of equipment or leasehold improvements.)

16. Transcript of Testimony at 110.

his interest in PDS was worth $900,000.00 and at that price he would have sold his interest. A rather eccentric method of evaluation is described in his testimony:

Q And you felt that [½ interest in PDS] was worth $900,000.00?

A Yes.

Q On what basis did you determine that?

A Just my opinion.

Q At the time that you prepared your financial statement did you analyze your opinion? Are you aware of any conscious thoughts that you had about it?

A No. I could only recall, as I stated in deposition, that Mr. Hermann and I one time at the house just sitting and talking had said—you know—just—not business talk, ... you know, "what—what would you take for half of—your half of the stock?" Mr. Hermann said, "A million dollars"; and I said, "Well, I wouldn't"—I—I —you know—we felt at that time we had a tiger by the tail and I wouldn't have taken a million for mine; and I don't know. I just had asked for an opinion or—I mean it was just an opinion, and I wrote down a—a value that I thought it was worth to me.

Transcript of Testimony at 194–95.

Debtor insists that in forming his opinion he did not consider the value of the PDS assets, the number or loyalty of patients, or any intangibles. He simply considered the amount for which he would have sold his interest.

Debtor's $100,000.00 valuation of his private corporate practice is likewise unrealistic. Yet the debtor insists his valuation, based on his opinion of the price at which he would have sold the stock, is correct. This insistence is difficult to understand because he testified that the value of the corporation's equipment, purchased be-

tween 1964 and 1971, was between $2,000.00 to $20,000.00. Accounts receivable when the debtor filed his bankruptcy petition totaled only $7,200.00. No contention is made that receivables were greater in May 1980, when the financial statement was prepared. There apparently were no other significant assets owned by the corporation.

Further, the debtor's representation that his personal effects, excluding automobiles, were worth $110,000.00 overstates their value by more than six hundred (600) percent. The personalty items owned by the debtor in May 1980 were essentially the same ones owned when his bankruptcy petition was filed in July 1982. Yet the aggregate value of the debtor's personalty, duly excluding automobiles and corporate stocks,[17] reported in his bankruptcy schedules is less than $18,000.00.

Debtor's estimate of his annual salary, $180,000.00, exceeds the earnings he and his wife jointly reported for 1980 ($36,513.23) by nearly five hundred (500) percent. According to the debtor the $180,000.00 figure represented his expectation of what he might earn in the twelve months following May 1980. He had begun to receive $5,000.00 monthly from PDS earnings and anticipated drawing $7,000.00 —$8,000.00 monthly by December 1980. While he devoted less time to his private practice, he expected to earn more because all of his expenses were to be paid by PDS. Since the gross receipts from his private practice for the tax years 1977 and 1978[18] both exceeded $140,000.00, the debtor expected to net approximately $100,000.00 annually from his private practice. Combining this projected salary with the anticipated earnings from PDS, the debtor estimated his income for the twelve-month period beginning May 1, 1980, would be $180,000.00. In fact, during the 1980 calendar year debtor earned only $8,770.40 from his

---

**17.** The debtor's representation in his financial statement that his personal effects were worth $110,000.00 did not include the value of either automobiles or any corporate stock; the values

of those items were reported in separate sections of his financial statement.

**18.** See note 8, *supra.*

private practice and received $20,000.00 from PDS.

The debtor's representation of his interest and the value of his real estate holdings is also incorrect.[19] However, the errors are immaterial to the issue before the court because plaintiff apparently did not rely upon this representation.[20]

### III

Plaintiff handled the PDS lease application in a customary manner. After Bill Dowland, plaintiff's account representative, reviewed the application and accompanying documents, including the disputed personal financial statement, he contacted debtor's bank reference and two PDS trade creditors. Also, reports from a credit bureau and Dun & Bradstreet, Inc. were obtained.

Debtor was required to furnish his personal financial statement in conjunction with the PDS lease application. According to Dowland's testimony, he would not have forwarded the application to plaintiff's regional credit manager without debtor's financial statement because PDS was in a "start-up situation:"

> P.D.S. was a company—a professional company that was like ten months old. Doctor Byrd in my understanding was the stockholder.... Then in turn he was the one man or the professional behind that corporation that would make a go of it. Therefore, we knew if anything happened, we would want Doctor Byrd to personally guarantee it. He was the—he was actually collateralizing the transaction. Then I had to know what his net worth was.

> [T]hey [PDS] didn't have the substantial net worth to justify a lease of, say, $90,000.00 [21] ... Dr. Byrd was the owner of the corporation ... so I knew that I would have to have his financial statements to verify that someone in that company ... had the income and the net worth to service the debt in case something happened to the Professional Dental Service Corporation.

Transcript of Testimony at 19–20, 22–23.

Dowland further testified that he relied upon the debtor's represented net worth and "the way his net worth was structured"[22] in recommending approval of the PDS lease application. It was particularly significant to Dowland that the debtor listed only two liabilities, whose sum was less than the reported value of the debtor's real estate holdings.

Ken Berk, plaintiff's regional credit manager responsible for the approval of the PDS lease application, testified that when dealing with a professional corporation he

---

**19.** Item No. 5 of the financial statement recites:

> *No. 5 Real Estate.* The legal and equitable title to all the real estate listed in this statement [two improved parcels] is solely in the name of the undersigned, except as follows:

The only signature at the bottom of the page is that of the debtor. Yet, he and his wife, whose name is inserted in the name blank of the financial statement, own the two parcels as tenants by the entirety.

Also, the debtor overstated the value of a Florida condominium, reportedly worth $42,-000.00, by approximately $10,000.00.

**20.** The cross-examination testimony of Ken Berk, who approved the PDS lease application on behalf of plaintiff, indicates a lack of reliance on representations relative to the debtor's real estate holdings:

> Q Now, I asked you [during a deposition] ... about the real estate and you really didn't let me finish my question. You said the real estate ... values weren't a part of this deal. Is that—
>
> A In my credit judgment that's correct.
>
> Q You didn't rely on any values to real estate?
>
> A I—you know—I looked at it, but as far as my credit judgment as far as—you know—it was just the as—it was two—two assets that he had on his statement.

Transcript of Testimony at 149.

Although Berk later testified he considered the real estate insofar as it contributed to the debtor's net worth, his previous testimony favors a finding that plaintiff did not rely upon the represented ownership and values of the debtor's interest in real estate.

**21.** This statement is enigmatic in view of Dowland's subsequent testimony that he was satisfied that the debtor had correctly represented the value of his stock. See Transcript of Testimony at 31.

**22.** Transcript of Testimony at 17.

usually requires a guarantee by the corporation's principal. According to Berk, he relied on the debtor's financial statement, though not exclusively; he realized that the $900,000.00 value assigned to debtor's interest in PDS represented the debtor's opinion; and he thought that PDS had ample earnings to service the lease indebtedness.

■ Plaintiff's reliance upon the debtor's representation in his financial statement of the value of the PDS stock is not reasonable. Plaintiff knew that PDS had only been operational for approximately one year and that the cumulative gross revenue of PDS from its inception through August 1980 was less than $800,000.00. Furthermore, plaintiff had access to an unaudited PDS earnings statement reflecting that the stockholders' equity was only $130,600.73 as of July 1980, two to three months after preparation of the debtor's financial statement.

■ However, the court has no hesitancy finding that plaintiff reasonably relied upon other material representations in the financial statement, particularly representations pertaining to the debtor's liabilities. None of the information gathered from third-party sources alerted plaintiff to the falsity of these other representations. Of course, exclusive reliance upon a false financial statement is not necessary to establish the element of reliance required under Code § 523(a)(2)(B)(iii). Partial reliance suffices. *In re Sewell,* 361 F.Supp. 516, 518 (S.D.Ga.1973); *Waterbury Community Fed. Credit Union v. Magnusson,* 14 B.R. 662, 668 (Bkrtcy.N.D.N.Y.1981).

## IV

■ Absent an intent to deceive, a debt incurred through the use of a false financial statement will not be excepted from discharge. *Feldenstein v. Radio Distrib. Co.,* 323 F.2d 892 (6th Cir.1963). *See also Gabellini v. Rega,* 724 F.2d 579 (7th Cir.1984) (debt dischargeable even though misrepresentation of gross sales figures made to purchaser of debtor's laundromat). Although a creditor seeking a determination of dischargeability must prove intent to deceive, such intent is logically inferred where a person knowingly or recklessly makes a false representation which he knows should induce another to advance credit. *Regency Nat'l Bank v. Blatz,* 37 B.R. 401, 404 (Bkrtcy.E.D.Wis.1984). Intent to deceive may be imputed when a debtor makes representations with a reckless indifference for the truth. *See Morimura, Arai & Co. v. Taback,* 279 U.S. 24, 33, 49 S.Ct. 212, 215, 73 L.Ed. 586 (1929). "Actual knowledge of falsity and conscious intent to deceive are not necessary, where [a] debtor ... [has] no reasonable ground to believe that the facts were correct." 3 *Collier on Bankruptcy* ¶ 523.09, 523–65 (15th ed. 1984).

The case before the court, in part, is factually similar to *Century Bank v. Clark,* 1 B.R. 614 (Bkrtcy.M.D.Fla.1979).[23] The bankrupt in *Clark* obtained a $3,950.00 loan on the strength of a financial statement reflecting assets valued at $1,833,-320.00 and liabilities in the amount of $82,-767.00. Certain stock owned by the bankrupt was valued at $1,500,000.00 in his financial statement. However, when the bankrupt prepared his financial statement this stock was worthless. Less than four (4) months after receiving the loan, the bankrupt filed his petition in bankruptcy. In his schedules he listed $449,542.21 in liabilities existing when he submitted his financial statement and procured the $3,950.00 loan. Some of these debts were corporate debts included in the bankrupt's schedules as a precautionary measure. However, this fact alone did not account for the immense disparity between the debts owed by the bankrupt when he obtained the $3,950.00 loan and the $82,767.00 in debts reported in his financial statement. The bankrupt proffered an explanation for the misrepresentation in the value of his

---

**23.** *Clark* involved section 17(a)(2) of the Bankruptcy Act of 1898. Bankruptcy Code § 523(a)(2), derived from section 17(a)(2) of the former Act, differs immaterially from its predecessor insofar as the instant case is concerned.

assets, but he offered no explanation for his omission of substantial liabilities. In discussing the intent necessary to support a determination of nondischargeability, Judge Paskay stated:

> While it is impossible to probe the inner processes of a borrower's mind in order to determine his intent, his actions speak louder than his words.... [W]hile fraud is never presumed and evidence showing the possibility of fraud or showing circumstances which might create a suspicion of fraud are not sufficient ... the fraud may be found to exist, even in the absence of direct proof, which of course, is rarely available. If the totality of the circumstances present a picture of deceptive conduct by the borrower, which indicates that the borrower intended to deceive and cheat the lender, the intended falsehood, coupled with this conduct, is sufficient to establish the requisite intent required under the Act. Applying these principles to the facts at hand, this Court is convinced that the Bankrupt did intend to deceive the plaintiff as to his credit worthiness. (Citations omitted.)

*Clark,* 1 B.R. at 617.

In the instant case the debtor concedes that he prepared the false financial statement. Although it was not originally prepared for the purpose of obtaining the lease agreement from plaintiff on behalf of PDS, the debtor knew that his financial statement was being utilized toward such a purpose. The fact that he may not have reviewed his financial statement prior to submission to the plaintiff does not aid the debtor; instead it illustrates his indifference to plaintiff's reliance on his representations. Further, his testimony that he felt the financial statement was true when prepared is insufficient to overcome the natural inferences based on the proof in this case.

▇▇▇ The unrealistic representations of asset value in the debtor's financial statement coupled with the omission of several sizeable liabilities demonstrate a reckless indifference to the actual facts, equating to an intent to deceive. *Houtman v.*

*Mann,* 568 F.2d 651, 656 (9th Cir.1978). Indeed, the debtor's omission in his financial statement of liabilities exceeding $200,-000.00, calculated according to the information in his own sworn schedules, is sufficient in and of itself to substantiate a finding of intent to deceive. Although the debtor's liability on most of the omitted obligations was contingent when his financial statement was prepared, the omissions are nonetheless inexcusable. *See In re Bebar,* 315 F.Supp. 841 (E.D.N.Y.1970) (omission of contingent liability renders financial statement materially false). No less than two obligations, totaling more than $85,000.00, arose in March 1980, less than two months prior to the preparation of debtor's financial statement. Debtor either knew or should have known that his financial statement was materially false due to his omission of several liabilities, contingent and noncontingent. *See Modern Distrib. Inc. v. Gray,* 22 B.R. 676, 680 (Bkrtcy. W.D.Wis.1982). *But see W.C.T.A. Fed. Credit Union v. Volpe,* 32 B.R. 314 (Bkrtcy.W.D.N.Y.1983) (no intent to deceive where debtor failed to list sole proprietorship debts in his personal financial statement).

## V

▇▇▇ In summary, PDS obtained property from the plaintiff through the authorized use of the debtor's materially false personal financial statement. The falsities of the statement consist of unrealistically inflated estimates of value and the omission of significant liabilities. Plaintiff's reliance on debtor's representation of the value of his interest in PDS was not reasonable; also, when it accepted the PDS lease application, plaintiff did not rely on debtor's representations pertaining to real estate holdings. However, plaintiff did reasonably rely upon other portions of the financial statement, particularly the debtor's statement of liabilities. Because the debtor demonstrated a reckless disregard for the facts in the preparation and publication of his financial statement equating to an intent to deceive, plaintiff's claim in the

amount of $114,006.70, plus a reasonable attorney fee in this action,[24] is excepted from discharge pursuant to 11 U.S.C.A. § 523(a)(2)(B) (1979).[25]

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.

24. Under the terms of the lease, PDS unconditionally promised to pay legal expenses relating to the lease incurred by plaintiff. The debtor not only guaranteed performance of the obligations of PDS under the lease, he also agreed to indemnify plaintiff for expenses associated with the enforcement of the guarantee. A reasonable attorney fee is recoverable by a creditor when his debtor has agreed to be liable for such fees and the principal indebtedness is nondischargeable by virtue of Code § 523(a)(2). *First Am. Nat'l Bank v. Crosslin,* 14 B.R. 656 (Bkrtcy.M.D. Tenn.1981); *First Am. Nat'l Bank v. Carter,* 14 B.R. 422 (Bkrtcy.M.D.Tenn.1981).

25. Plaintiff's claim includes $9,756.95 representing its loss of an investment tax credit allowable under the Internal Revenue Code. Although the debtor currently objects to the allowance of this portion of the claim, his attorney's former associate previously approved an agreed order dismissing, with prejudice, the objection to plaintiff's unsecured claim for $114,006.70 against the PDS bankruptcy estate. Since the debtor concedes the approval of the agreed order was authorized, he is estopped to challenge the amount of plaintiff's claim. See *Montana v. United States,* 440 U.S. 147, 155, 99 S.Ct. 970, 974, 59 L.Ed.2d 210 (1979) (though not a party to previous litigation United States had sufficient "laboring oar" in conduct of proceeding to actuate estoppel principles).