In re Gerrald W. NANCE, Debtor.

**BORG WARNER CENTRAL ENVIRON-MENTAL SYSTEMS, INC., Plaintiff,**

v.

Gerrald W. NANCE, Defendant.

**In re Douglas W. McCORMACK, Debtor.**

**BORG WARNER CENTRAL ENVIRON-MENTAL SYSTEMS, INC., Plaintiff,**

v.

Douglas W. McCORMACK, Defendant.

Bankruptcy Nos. 385–30993 M–7, 385–30994 F–7.
Adv. Nos. 385–3596, 385–3647.

United States Bankruptcy Court, N.D. Texas, Dallas Division.

Feb. 9, 1987.

Robert G. Boomer, Dallas, Tex., for plaintiff.

Greg Gutman, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

ROBERT C. McGUIRE, Chief Judge.

This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law under Bankruptcy Rule 7052 with respect to the trial on December 18, 1986.

Gerrald W. Nance ("Nance" or "Defendant") filed for bankruptcy on approximately April 10, 1985. On July 22, 1985, Borg Warner Central Environmental Systems, Inc. ("Plaintiff") filed a complaint to determine the dischargeability of Nance's debt to it. Shortly thereafter, Plaintiff filed a similar complaint against Douglas Wayne McCormack ("McCormack" or "Defendant"), Nance's former partner who had also filed bankruptcy. Each Defendant answered the respective complaints, and on September 23, 1985, this Court signed a pretrial order that these adversary proceedings be tried concurrently.

Because the factual background in the two adversary proceedings was basically the same, and they were tried concurrently, Plaintiff argued facts and law in support of each adversary proceeding.

Plaintiff is in the business of manufacturing and selling heating and air conditioning equipment and accessories. Prior to 1984, Ryan Air Conditioning & Heating, Inc. ("Ryan A/C & H") had been a customer of Plaintiff. On approximately April 1, 1984, Defendants Nance and McCormack, and an individual named Garland Tackett purchased the business and shortly thereafter formed a new corporation known as Ryan Mechanical, Inc. ("RMI"). At that time, the entire balance owed to Plaintiff, in the approximate amount of $24,743.29, was transferred to RMI's account.

A portion of the consideration paid by RMI for the assets of Ryan A/C & H included the assumption by RMI of Ryan A/C & H's outstanding open account obligation to Plaintiff, which stood at $24,743.29 as of March 31, 1984.

Plaintiff received actual notice of the sale of the business of Ryan A/C & H to RMI in March, 1984.

In April, 1984, Plaintiff began to extend trade credit to RMI without requiring any additional documentation, guaranties, credit application or credit references.

Defendants first met with Sam Burgess, Plaintiff's financial manager, in late May or early June of 1984. At that meeting, Mr. Burgess reviewed the account and requested that the Defendants supply him with a financial statement for the company in order to document support for the credit relationship. At the time of the meeting, the outstanding credit balance on the RMI account with Plaintiff approximated $50,000, including the balance assumed from Ryan A/C & H by RMI.

The business did not fare much better under the new ownership, and in approximately June, 1984, RMI owed Plaintiff approximately $70,000 to $77,000 on open account. At about that time, Defendant Nance gave Mr. Burgess a copy of a corporate financial statement. There is no contention about material falsity in the corporate financial statement. Mr. Burgess indicated it was unsatisfactory, and that he would require personal financial statements, and, assuming they were satisfactory, personal guarantees of Defendants Nance and McCormack (collectively "Defendants").

In or about July, 1984, Defendants met with Mr. Burgess and each Defendant presented Plaintiff with personal financial statements. Each Defendant had very recently married for the second time and said financial statements, to some extent, listed

assets that were owned by their wives as separate property, as well as alleged assets that were owned by other parties, and allegedly materially overvalued other assets.

During the course of the July, 1984 meeting, Burgess expressed serious concern about the size of the outstanding account and Defendants' ability to reduce it. In line with that concern, Burgess directed Defendants to execute personal guaranties of the account prepared by Plaintiff, which were then back-dated by an employee of Plaintiff to May, 1984. Burgess also directed Defendants to take immediate steps to reduce the size of the outstanding credit balance.

At the July, 1984 meeting, Burgess stated that, in the absence of personal guarantees of the principals, in the future all purchases would be for cash and RMI would be expected to pay additional sums of money to pay down its present outstanding account balance.

Upon review of the personal financial statements by Mr. Burgess, Plaintiff agreed to open up the credit line of RMI and extend it credit up to ninety days, if Defendants would personally guarantee the account. Defendants signed personal guarantees in favor of Plaintiff, and Plaintiff, allegedly relying on said guarantees and the supporting financial statements, extended further credit to RMI.

By early 1985, RMI was out of business and Defendants filed their respective bankruptcy petitions. At the time of the filings, RMI and Defendants allegedly owed Plaintiff approximately $26,442.26, all on account of invoices dated in late 1984 and early 1985, several months after the financial statements were given. Per the parties' agreement, all payments as received had been applied to the oldest invoices.

The issue in these adversary proceedings being tried concurrently is whether the debt which Defendants owe Plaintiff is nondischargeable under § 523(a)(2)(B) of the Bankruptcy Code. It is Plaintiff's position that the debt of each Defendant is nondischargeable because the financial statements were materially false and Plaintiff reasonably relied thereon. The parties stipulated that if the debt was non-dischargeable against both Defendants, Plaintiff was entitled to attorney fees of $7,000, but if it was non-dischargeable against only one Defendant, then Plaintiff was entitled to $6,000 attorney fees.

Plaintiff seeks to except these debts from discharge pursuant to 11 U.S.C. § 523(a)(2)(B) which provides in relevant part:

(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

In or about July, 1984, Defendants each presented Plaintiff with written financial statements. These financial statements were attached as Exhibit A to each of the respective complaints.

Defendant McCormack's financial statement is dated July 5, 1984, and is signed "Doug McCormack". Defendant Nance's financial statement is dated July 5, 1984, and is signed "Gerrald Nance".

■ In order to come within the exception of § 523(a)(2)(B), the financial statement must either have been written by the debtor, signed by the debtor, or the particular writing must have been adopted and used by the debtor. 3 *Collier on Bankruptcy,* ¶ 523.09[1] (15th ed. 1986), citing *In re Gonzalez,* 287 F.Supp. 281 (S.D.N.Y. 1968). Both financial statements were

signed and used by the Defendants to obtain additional credit.

Defendants personally obtained the additional credit for RMI. "It is well-settled that where the debtor is an officer and shareholder of a corporation and he uses a false financial statement to induce a creditor to extend credit to the corporation, the individual debtor is considered to have obtained money within the meaning of § 523(a)(2)(B)." *In re Delano,* 50 B.R. 613, 617 (Bkrtcy.D.Mass.1985). Consequently, by providing the signed written financial statements, Defendants "obtained" credit pursuant to § 523(a)(2)(B). There were meetings between Mr. Burgess and Defendants wherein Mr. Burgess explained that the corporate financial statements were insufficient to continue the existing credit line, and, thus, personal financial statements and personal guarantees would be required before further credit would be granted. As a result of these discussions, Defendants provided the written financial statements.

A materially false financial statement is one which "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *In re Denenberg,* 37 B.R. 267 (Bkrtcy D.Mass.1983), citing *In re Hunt,* 30 B.R. 425, 440 (Bkrtcy.M.D.Tenn.1983). The Court, in *In re Valley,* 21 B.R. 674 (Bkrtcy.D.Mass.1982) states that materiality should be judged by comparing the debtor's actual financial condition with the picture debtor paints of it.

### DEFENDANT McCORMACK'S FINANCIAL STATEMENT

Defendant McCormack's financial statement contained various material representations with regard to both ownership of properties, as well as statements in value. Said representations included the following:

a. Defendant McCormack represented that the residential property at 2219 English Drive, Garland, Texas had a value of $68,500 with a $6,000 mortgage and that he was the sole owner of this property. However, the testimony showed that his ex-wife owned one-half of this property. Even if Defendant McCormack is given the benefit of the doubt as to the valuation of the property, his misstatement resulted in a $31,250 overstatement of his net worth.

b. He represented that he owned a $17,000, 17–acre tract of land that was actually owned by his mother. His explanation of this discrepancy was that he thought he was going to inherit it.

c. He represented that he was the owner of a $140,000 jumbo certificate of deposit ("CD"). In fact, as Defendant McCormack has admitted, this jumbo CD was not his property at all, but rather was in trust for his wife and his wife's children. This was a misrepresentation of $140,000.

Defendant McCormack stated his net worth to be $475,655, while in actuality his liquid net worth appears to have been significantly less.

The misrepresentation made with regard to the jumbo CD was material in that it represented the bulk of his liquid assets.

The most important listings on the financial statement included values represented as liquid assets. These primarily included the $100,250 in marketable stocks and the jumbo CD of $140,000. Together, these amounted to $240,250. When offset by the loan at Dallas Federal of $123,000, the resulting amount of liquid assets is approximately $117,250. This was a significant and substantial amount with which Plaintiff's Credit Manager used to make a reasonable business decision to grant further credit.

### DEFENDANT NANCE'S FINANCIAL STATEMENT

On March 25, 1984, Defendant Nance submitted a financial statement to the American National Bank of Terrell in order to obtain a line of credit for RMI. Therein,

he represented his net worth to be $34,000. Slightly more than three months later, on or about July 7, 1984, Defendant Nance submitted another financial statement to Plaintiff which represented his net worth to be $163,719. Thus, within three months, Defendant Nance's net worth allegedly increased by $129,719. Plaintiff contends that said alleged increase is attributable to deception and material falsity by Defendant Nance.

A comparison of the two financial statements reveals that the alleged $129,000 increase in net worth was a result of the addition of the following equities:

| ADDITIONS PRESENT ON JULY STATEMENT | ALLEGEDLY OVERSTATED AMOUNTS |
|---|---|
| 1. A $12,000 increase in automobile equity. | $14,000 |
| 2. A $21,000 equity in a homestead. | 15,000 |
| 3. A $60,000 equity in commercial real estate. | 33,000 |
| 4. A $35,000 increase in other assets. | 32,700 |
| | $94,700 |

Plaintiff contends that allegedly $94,700 of the alleged $129,000 increase is a direct result of Defendant Nance's materially false representations.

■ While on their face the two financial statements do *prima facie* raise concerns as to material falsity of Nance's financial statement in question, Nance was able to give reasonable explanation as to the more serious apparent discrepancies. Furthermore, Plaintiff's Credit Manager testified he was not relying on the possibly exempt property in the financial statements, to wit, diamonds, jewelry and painting. Thus, it appears that on Nance's financial statement, Plaintiff did not meet its burden of proof under § 523(a)(2)(B)(iii).

The most serious discrepancy on the Nance financial statement has to do with the alleged $60,000 equity in commercial real estate that was listed on the July, 1984 financial statement, and Plaintiff asserts such was a materially false representation. The commercial real estate was valued on the statement at $330,000. The loan against said real estate was $270,000. Defendant Nance represented that he owned a $60,000 equity in the property. However, in testimony, he admitted that he was the owner of *only* 45% of this property. Therefore, Defendant Nance's alleged equity in the property amounted to only $27,000. The resulting overstatement was in the approximate amount of $33,000. Nance testified that in agreement with McCormack and Tackett, the other owners of the property, only he listed the property. The McCormack and Tackett financial statements did not list ownership of such property. Regardless of the reasonableness of this explanation, for this creditor to have reasonably relied on this alleged $33,000 discrepancy, the creditor would reasonably have to have made more investigation into the value of the property.

## MISREPRESENTATION OF OWNERSHIP CAN BE A MATERIAL FALSITY PURSUANT TO § 523(a)(2)(B)

The Courts have held that misrepresentation of ownership is a material falsity sufficient to deny dischargeability pursuant to § 523(a)(2)(B). In *In re Winfree*, 34 B.R. 879 (Bkrtcy.M.D.Tenn.1983), where the debtor misrepresented the ownership of assets on his financial statement, the Court held that "the misrepresentation of ownership of assets and the failure to divulge the true ownership interest in the listed property is 'material falsity' for purposes of § 523(a)(2)(B)." In *In re Rodriguez*, 29 B.R. 537 (Bkrtcy.E.D.N.Y.1983), the court held that a failure to disclose the joint ownership of property with the debtor's wife rendered the debt to be non-dischargeable.

Specifically, Defendant McCormack misrepresented the ownership of the $140,000 jumbo CD. In the *Matter of Rickey*, 8 B.R. 860, 863 (Bkrtcy.M.D.Fla.1981), the court found a failure to disclose the true ownership of a certificate of deposit was a material falsity.

He also misrepresented his ownership interest in the residential property at 2219

English, Garland, Texas. In the case of *In re Brown*, 32 B.R. 554, 557 (Bkrtcy.E.D. Tenn.1983), the court found that the debtor's financial statement "omits any disclosure of his wife's joint interest in four of the six tracts in which debtor has an ownership interest." The Court held this to be a material falsity. Defendant McCormack failed to represent the true ownership of the residential property at 2219 English, Garland, Texas. The misrepresentation as to the 2219 English property or the $17,-000, 17–acre tract standing alone would have presented a more difficult question. However, same may be considered as part of the totality of the McCormack financial statement.

■ Section 523(a)(2)(B)(iii) requires that the creditor reasonably rely upon a materially false statement. Plaintiff reasonably relied upon the materially false financial statements provided by Defendant McCormack in granting the extension of credit to RMI. Even partial reliance upon a financial statement is sufficient. *In re Harmer*, 61 B.R. 1 (Bkrtcy.D.Utah 1984).

■ In *In re Janes*, 51 B.R. 932 (Bkrtcy. D.Kan.1985), the court stated that "an inference of reliance is created when a financial statement is made to support an application for credit, and credit is given thereafter." Thus, an inference of reliance arises in the instant case in that the financial statement was provided in support of a further extension of credit.

*See also, Flagship Bank of Tampa v. Albert M. Davidson and Clarence S. Dick*, 6 B.R. 159, 7 B.C.D. 52 (Bkrtcy.M.D.Fla. 1980).

In *In re Gadberry*, 37 B.R. 752 (Bkrtcy. C.D.Ill.1984), the court stated that "reliance to the creditor's detriment is the key." The court found that the extension of "fresh cash" in reliance upon a false financial statement was sufficient detriment. In the instant situation, the creditor extended "fresh cash" to RMI in reliance upon the Defendant McCormack's financial statement, as did the bank in *Gadberry*. In *Gadberry*, the court ultimately held that the fresh cash which was extended was *not* dischargeable.

The legislative history of § 523(a)(2)(B) discusses refinancing of existing credit, and indicates that the term "detriment" encompasses an extension of monies as well as a forfeiture of remedies. In this matter, both are apparent. First, fresh credit was extended in reliance upon the McCormack financial statement.

Plaintiff also reasonably relied on the McCormack personal guaranty and supporting financial statement and did not file any lawsuit for collection on the account or seek to file liens on its debt. Because of the paucity of lien information in its files at that time, Plaintiff would have had difficulty filing liens. The reliance issue under § 523(a)(2)(B) is qualified by the term "reasonable". The courts have held that reliance on the financial statements "need not be an absolute reliance or the sole factor", but rather need only be the "precipitant, the catalyst for the loan, without which the loan would not have been made." *In re Mutschler*, 45 B.R. 482, 492 (Bkrtcy. D.N.D.1984). In other words, the false financial statement must be proven to be a "significant factor in extension of credit, in the absence of which the extension would not have been made." *In re Mutschler, supra*, at 492.

In *In re Patch*, 24 B.R. 563, 567 (Bkrtcy. D.Md.1982), the court stated that the "reasonableness of a creditor's reliance" should be judged by "comparing the creditor's actual conduct with (1) a creditor's own normal business practices, and (2) the standards and customs of the industry, (3) in light of the surrounding circumstances existing at the time the application was made and credit extended." In this matter, Plaintiff's actual conduct was in accordance with Plaintiff's own normal business practices and the standards and customs of the industry in light of the circumstances.

Plaintiff's business decision in this instance was consistent with its normal business practices.

In *In re Brown*, 55 B.R. 999, 1004 (Bkrtcy.E.D.N.Y.1986), the court stated the general rule that "[s]ince it is virtually impossible to obtain direct proof of one's intent to deceive, intent can be inferred from the surrounding circumstances." In *In re Rodriguez, supra,* the court held that intent to deceive will be inferred where a person knowingly or recklessly makes a false representation which he knows or should know will induce another to make a loan. In the instant matter, intent to deceive will be inferred because Defendant McCormack knowingly made false representations which he knew or should have known would induce Plaintiff to extend the requested credit.

In the *Matter of Rickey, supra,* the court found that, where a debtor stated that he was the sole owner of property when he in fact knew that he was not (his property was held in joint tenancy with his wife), intent was inferred from the fact that he knew his statements were false. The court found the debt, which arose as a result of reliance upon the debtor's false statements, to be nondischargeable on that basis alone.

Defendant McCormack represented ownership in a $140,000 jumbo CD which was not owned by him, and, in reality, not even owned by his wife. The jumbo CD was in trust for his wife and his wife's children. Unquestionably, Defendant McCormack had knowledge of this fact. As a result, Defendant McCormack's knowledge of his non-ownership of this property and his false statement of ownership demonstrates his intent to deceive.

In *Matter of Clark,* 1 B.R. 614,617 (Bkrtcy.M.D.Fla.1979), the court summarized this area of the law as follows:

> While it is impossible to probe the inner processes of a borrower's mind in order to determine his intent, his acitons speak louder than his words.... [W]hile fraud is never presumed and evidence showing the possibility of fraud or showing circumstances which might create a suspicion of fraud are not sufficient, ... the fraud may be found to exist, even in the absence of direct proof, which of course, is rarely available. If the totality of the circumstances present a picture of deceptive conduct by the borrower, which indicates that the borrower intended to deceive and cheat the lender, the intended falsehood, coupled with this conduct, is sufficient to establish the requisite intent required under the Act.

In *In re Byrd,* 41 B.R. 555, 563 (Bkrtcy. E.D.Tenn.1984), the court stated that intent to deceive "may be imputed when a debtor makes a representation with a reckless indifference for the truth." 3 *Collier on Bankruptcy* ¶ 523.09 (15th ed. 1986).

In *In re Barnacle,* 44 B.R. 50, 55 (Bkrtcy.D.Minn.1984), the court stated that if the financial statement contained "significant, glaring errors" that displayed a "total disregard for the creditor", then intent would be inferred. Furthermore, the Court stated that if the other elements were proven so to provide a *prima facie* case, by showing a significantly incorrect financial statement, then the burden of proof would shift to the debtor to "show how he could have offered such a glaringly incorrect credit application without an intent to deceive."

In *In re Blatz,* 37 B.R. 401, 404 (Bkrtcy. E.D.Wis.1984), the court stated that where a "financial statement is so replete with significant errors as to constitute, at a minimum, gross recklessness.... intent to deceive may logically be inferred."

The court in *In re Mutschler, supra* at 491, stated that "where the debtor is an individual of intelligence and experience in financial matters, courts have been more inclined to hold them responsible for uttering a false financial statement."

Defendant McCormack had been in the heating and air conditioning business since approximately 1970. However, he was more of an "outside" rather than "inside" man. He was not necessarily sophisticated. His intelligence was difficult to evaluate except in terms of past business success. He had prepared one or two financial statements in the past. His April,

1982 divorce decree (Plaintiff's Ex. No. 12) was offered into evidence and showed a division of property between him and his former wife showing that in 1984 he should have had the basic knowledge about separate and community property, and that the $140,000 CD belonged to his present wife as her separate property. Furthermore, such divorce decree showed the ownership status of the 2219 English property. He listed approximately $40,000 of his new wife's personal property as his own, testifying that he thought they were his also. While perhaps not relied upon by the creditor, it also is part of the totality of his misrepresentations.

While some courts have allowed an inference to arise with respect to intent to deceive, other courts have held that proof of the first three elements of a false financial statement creates a "presumption that the debtor made the statement with intent to deceive." *In re Harms*, 53 B.R. 134, 141 (Bkrtcy.D.Minn.1985). Under this approach, after the plaintiff presents a *prima facie* case "of the first three elements, the burden of production shifts to the debtor. If the debtor does not produce evidence of lack of intent, the plaintiff may rely on the presumption." *In re Harms, supra,* citing *In re Tomeo,* 1 B.R. 673, 677 (Bkrtcy.E.D. Pa.1979).

■ There was insufficient proof that RMI agreed to pay Plaintiff's claim for the A & P fund, to wit, $4,952.63. Therefore, Plaintiff's debt against McCormack is not dischargeable in the amount of $21,489.63, statutory interest, $6,000 attorney fees, and judgment interest. Plaintiff's claim against Nance is discharged. Judgment will be entered in accordance with the foregoing Memorandum Opinion.