In re Barbara CHRYST, Debtor.

FRANKFORD BANK a/k/a Frankford Trust Company, Plaintiff,

v.

Barbara CHRYST, Defendant.

Bankruptcy No. 92–23776 DWS.
Adv. No. 93–2055.

United States Bankruptcy Court,
E.D. Pennsylvania.

Oct. 3, 1994.

**490**

Paul B. Maschmeyer, Philadelphia, PA, for debtor.

Christopher G. Gorbey, Media, PA, for Frankford Bank.

Joseph Minni, U.S. Trustee, Philadelphia, PA.

### MEMORANDUM OPINION

DIANE WEISS SIGMUND, Bankruptcy Judge.

Before the Court is the Complaint filed by Frankford Bank a/k/a Frankford Trust Company (the "Bank") under 11 U.S.C. § 523(a)(2) objecting to the discharge of a debt arising out of the Debtor Barbara Chryst's guaranty of certain loans made by the Bank to her various businesses.[1] Trial was held on April 7, 1994, April 8, 1994 and May 12, 1994.[2] After a protracted briefing schedule, this matter is now ready for decision.[3]

---

1. By Order dated May 20, 1993 of the Honorable Thomas M. Twardowski, Count II of the Complaint alleging fraud under 18 U.S.C. § 1014 and Count III alleging fraud under 18 U.S.C. § 1344 were dismissed on the Motion of the Debtor. On November 17, 1993, the bankruptcy case, including this adversary proceeding, was transferred to the Honorable Diane W. Sigmund as part of the case reassignment program implemented upon the appointment of two new bankruptcy judges in the Eastern District of Pennsylvania.

2. The record of the first day of the trial shall be referred to as Record I; the record of second day of trial shall be referred to as Record II; and the record of the final day of the trial shall be referred to as Record III.

3. In its Complaint, the Bank also requests that (1) the automatic stay be lifted with respect to its claims, (2) it be permitted to pursue its claims under applicable state and federal laws, and (3) any transfers which Debtor made for the benefit of other creditors during the 90 days prior to her bankruptcy filing be set aside and the funds turned over to the United States Trustee. These matters were also raised in separate motions which the parties have requested be continued until the § 523(a)(2) issue was resolved. To the extent they are pursued by the Bank, they will be done so pursuant to those motions.

## BACKGROUND

Prior to filing for bankruptcy,[4] the Debtor operated two retail travel agencies, Custom Travel Service, Inc. ("Custom I") and CMCEX, Inc. d/b/a Custom Travel Service II ("Custom II"), and a wholesale travel agency, Voyage International ("Voyage" together with Custom I and Custom II, the "Companies"), which marketed European tours to retail travel agencies, including Custom I and II. The Debtor was an officer and the majority owner of each of these corporations, with family members and/or acquaintances owning the remainder of the stock.

The Debtor's relationship with the Bank began on December 10, 1984 when Custom I was granted a $15,000 line of credit from the Bank ("1984 LOC"). The Debtor personally executed an unlimited Guaranty of the 1984 LOC. Exhibit T–3. On July 9, 1991, the 1984 LOC was increased by $25,000 to $40,-000 (the "Custom I LOC"). The Debtor personally executed an unlimited Guaranty of the Custom I LOC. Exhibit T–10. The Bank's representative with whom the Debtor dealt was Jane Ward, a commercial loan officer and vice president. She testified that the personal guaranty was a condition of extending the Custom I LOC. Record I at 21–22. In order to induce the Bank to increase the availability under the 1984 LOC to $40,000 under the Custom I LOC, the Debtor submitted to the Bank, and the Bank claims to have relied upon, Debtor's personal financial statement dated July 8, 1991, Exhibit T–6, and a detailed aged analysis of open invoices of Custom I through June 27, 1991, Exhibit T–7. Record I at 19–20.[5]

The Debtor next approached the Bank in September, 1991 and requested a $50,000 loan to open a second store, Custom II. The Bank agreed to loan only $25,000 (the "Custom II LOC"). The Bank further suggested that the loan be made to Custom I and that Custom I downstream the money to Custom II. Record I at 26. In connection with the Custom II LOC, the Debtor executed an unlimited Guaranty dated September 18, 1991, Exhibit T–13.

Next, in December, 1991, the Bank established a $30,000 line of credit for Voyage to provide working capital (the "Voyage LOC" and with the Custom I LOC and the Custom II LOC, the "Loans"). Record I at 29. The Debtor personally executed an unlimited Guaranty of the Voyage LOC. Exhibit T–19. In order to induce the Bank to make the loan to Voyage, the Debtor gave the Bank Voyage's income statement for the year 1991 through September 30, 1991, Exhibit T–15, and a detailed aged analysis of Voyage's open invoices, Exhibit T–18. In addition, the Debtor sent the Bank a letter dated November 15, 1991 stating that while business "has been the lowest, it has been the most profitable". Exhibit T–17. In May, 1992, the Debtor sent the Bank Voyage's income statement for the calendar year ending December 31, 1991, Exhibit T–22, Voyage's balance sheet, Exhibit T–22, and her personal financial statement as of May 14, 1992, Exhibit T–23.

On June 25, 1992, Ward and the Debtor met to discuss, *inter alia*, Ward's concerns regarding the financial information transmitted in May. The Bank's analysis of this information indicated that Custom I and Voyage had negative net worths as of year end 1991. Exhibit T–25. Ward claims that the Debtor told her that Custom I's and Voyage's financial statements were not representative of the conditions of the businesses because they were cash statements which did not reflect accounts receivable which were at an all time high while accounts payable were low. Record I at 38; Record II at 25. Following the meeting, the Bank agreed to extend the Custom I LOC which expired in May or June of 1992 until August 31, 1992 in order to allow the Debtor time to prepare accrual based financial statements. Record I at 39–40. The Debtor did not tell Ward that she had recently laid herself off

---

**4.** On October 2, 1992, the Debtor filed a petition under Chapter 13 of the United States Bankruptcy Code (the "Code"). Debtor converted the case to one under Chapter 11 on October 28, 1992.

**5.** The Bank also claims to have relied upon a Custom I 1990 year end financial statement in connection with making the CTSI LOC. *Id.* This financial statement was not offered into evidence at the trial.

and was collecting unemployment. The Debtor collected her first unemployment check on or about June 6, 1992. Exhibit T–37.

In July 1992, the Debtor used $65,000 of $147,000 collected by Custom I as a deposit for a large group trip (the "Commonwealth Trip") to pay down the Custom I and Custom II LOCs to zero. These funds were ultimately to be used to pay for the trip being booked. However, Ward advised Debtor that it would be in the interest of Custom I and II to pay down the LOCs in order to save on the accrual of interest. Record I at 45; Record II at 149. The Debtor was willing to do so so long as she could reborrow the funds since the money "is not my money; this is my client's money." Record II at 149.

On September 28, 1992, Ward, noting that the extended Custom I LOC had expired, contacted the Debtor to discuss her progress in securing accrual based financial statements. Ward and the Debtor arranged to meet on October 5, 1992. Record I at 47. On October 2, 1992, the Debtor reported to Ward that she had closed Custom I and Voyage and filed for personal bankruptcy that morning. Record I at 48.

The Bank claims that the Debtor made the following fraudulent representations and failed to disclose the following material information, as the case may be, for the purpose of inducing the Bank to make and extend the Loans:

(1) the Debtor made oral and written false representations that Custom I, Custom II and Voyage were doing well and sales for Custom I were skyrocketing;

(2) the Debtor fraudulently represented that Custom I's and Voyage's financial statements were not representative of the business because they were cash based financial statements, rather than accrual based, and did not reflect those Companies' high level of accounts receivable and low level of accounts payable;

(3) the Debtor fraudulently misrepresented the purposes for the Loans, and in partic-

ular that the purpose for the Voyage LOC was working capital when she intended to use it for other purposes, including the repayment of loans to herself and other insiders;

(4) the Debtor fraudulently represented that Custom II would be a wholly owned subsidiary of Custom I;

(5) the Debtor failed to inform the Bank that she had been laid off by Custom I and Voyage in the beginning of June, 1992 and was collecting unemployment;

(6) the Debtor failed to disclose to the Bank in August 1992 that her accountant advised her to close Custom I and Voyage and that she subsequently did so; and

(7) the Debtor fraudulently misrepresented her true financial condition by overstating her annual income and the value of her personal assets in written financial statements provided to the Bank.

The Bank claims that it reasonably relied upon these fraudulent misrepresentations and was damaged in that it made Loans in the aggregate amount of $95,000 to the Debtor. Consequently, the Bank claims that the Debtor's debt to the Bank under the Guaranties is nondischargeable under §§ 523(a)(2)(A) and (B).[6]

**DISCUSSION**

I.

*Section 523(a)(2)(A).* In order to succeed on a claim under § 523(a)(2)(A), the Bank must prove the following elements:

(1) the Debtor made a representation;

(2) that at the time the Debtor knew it was false or contrary to her true intentions;

(3) that she made the representation with the intention and purpose of deceiving the Bank;

(4) that the Bank relied on such representation; and

(5) that the Bank sustained the alleged loss and damages as a proximate result of the false representation.

---

**6.** The Debtor claims that we may not consider the Bank's request for relief under § 523(a)(2)(B) because the Bank did not specifically request relief under that section in the Complaint. We disagree for the reasons stated below.

*See United States v. Stelweck (In re Stelweck),* 86 B.R. 833, 846 (Bankr.E.D.Pa.1988), *aff'd,* 108 B.R. 488 (E.D.Pa.1989). *See also Fluehr v. Paolino (In re Paolino),* 75 B.R. 641, 646 (Bankr.E.D.Pa.1987) (same). The "representation" under § 523(a)(2)(A) can be a spoken or written representation, other than a statement regarding the debtor's financial condition which is governed by § 523(a)(2)(B), or an act by debtor. Moreover, a representation may also be made by way of silence. *Caspers v. Van Horne (In re Van Horne),* 823 F.2d 1285, 1288 (8th Cir. 1987). Because it is unlikely that any debtor will admit to acting in a fraudulent manner or intending to deceive a creditor, courts have held that "fraud may be proven by direct or circumstantial evidence". *Lipka v. Donley (In re Donley),* 115 B.R. 502, 503 (Bankr.E.D.Pa.1990); *First Baptist Church v. Maurer (In re Maurer),* 112 B.R. 710, 713 (Bankr.E.D.Pa.1990). Reliance under § 523(a)(2)(A) must be reasonable. *Paolino,* 75 B.R. at 646. The Bank must prove the elements under § 523(a)(2)(A) by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 287–88, 111 S.Ct. 654, 659–60, 112 L.Ed.2d 755 (1991).

■ Exceptions to discharge must be narrowly construed against the creditor and in favor of the debtor to preserve the debtor's "fresh start". *Applebaum v. Henderson (In re Henderson),* 134 B.R. 147, 155 (Bankr. E.D.Pa.1991); *Donley,* 115 B.R. at 503.

With the foregoing general principles in mind, we turn to the facts presently before the Court.

To begin with, § 523(a)(2)(A) specifically excepts from its terms statements concerning the financial condition of the Debtor or an insider of the Debtor. *See Blackwell v. Dabney (In re Blackwell),* 702 F.2d 490, 492 (4th Cir.1983) (oral representations concerning the debtor's or an insider's financial condition are "outside the scope of 11 U.S.C. § 523(a)(2) and can not be the basis for preventing discharge of the bankrupt."); *Volk of Philadelphia, Inc. v. Gelfand (In re Gelfand),* 47 B.R. 876, 878 (Bankr.E.D.Pa. 1985) (because the court construed the debtor's representation of solvency as a financial statement, the creditor's argument under

§ 523(a)(2) "must fail because of the lack of a writing".) *See also Chemical Bank v. Sigrist (In re Sigrist),* 163 B.R. 940, 947 (Bankr. W.D.N.Y.1994) (same); *Norwest Bank of Iowa, N.A. v. Orndorff (In re Orndorff),* 162 B.R. 886, 889 (Bankr.N.D.Okl.1994). Custom I, Custom II and Voyage are all insiders of the Debtor. Code § 101(31)(a)(iv). Statements by the Debtor concerning their financial condition, as well as her own, as alleged in contentions numbered 1 and 2 above therefore are not actionable under § 523(a)(2). We will next consider whether the other alleged fraudulent representations of the Debtor satisfy the requirements of § 523(a)(2)(A).

## A.

■ The Bank claims that the Debtor represented that the Voyage LOC was to be used for working capital to purchase blocks of hotel rooms in Europe for resale. Record I at 28–29. The Debtor denies that she told Ward that the Voyage LOC would be used to buy blocks of rooms testifying that it was not Voyage's business practice to "buy" blocks of rooms. Rather, according to the Debtor, the purpose of the Voyage LOC was to provide working capital for Voyage. Record II at 135, 136.

We credit the Debtor's testimony that the Voyage LOC was intended to be used for working capital. While the Bank's concept of working capital and the Debtor's may differ, we cannot find that the Debtor's use was other than she intended. We recognize that the Debtor did not specifically tell the Bank that a portion of the Voyage LOC was to be used to pay a debt owed to her by Voyage, but also find credible Debtor's explanation that she repaid loans that carried a high rate of interest since the funds were borrowed on her credit cards. Thus, in paying off these loans, Voyage reduced the cost of its debt service which arguably created additional working capital for Voyage. In any event, the Bank had to be aware of the debt because it was listed on Voyage's financial statement. Exhibit T–15. Moreover, a review of Voyage's check register shows payments made by Voyage for hotel payments and printing services as testified to by the

Debtor, which by any definition is the use of the funds for working capital. Record II at 134–36.

The Bank devoted a significant amount of time during the trial introducing many exhibits to show that the Debtor used the Loan proceeds for other than the Debtor's stated purposes. For example, the Bank introduced into evidence Bank and Companies' records which showed that funds were frequently transferred between Custom I, Custom II, and Voyage. The Debtor credibly testified that monies flowed between the Companies for legitimate business reasons. For example, employees of Custom I would work for Custom II or Voyage as needed and a fee would be paid to Custom I for their services. Record II at 140–41. The Bank has not indicated why the Debtor was obligated to discuss this business practice with it. More significantly, the Bank admitted that its own records showed the flow of funds between Custom I, Custom II and Voyage. Bank's Memorandum of Law at 8. The Bank's now stated concerned about the flow of monies between the Companies is not supported by its failure to question that practice which was reflected in its own records.

The Bank appears to especially focus on the Debtor's use of funds available under the LOCs immediately prior to the closure of Custom I and Voyage to repay loans owed to the Debtor individually and other insiders as well as other creditors, thereby increasing the Bank's exposure at a time the Debtor knew it would not have funds to repay the Bank. See Exhibits T–46, T–47, T–48. These funds were available due to the paydown of the Custom I and II LOCs in July 1992 with the Commonwealth Trip deposit which the Bank contends the Debtor did in order to give the appearance that business was well. Record I at 45–46. The fallacy in the Bank's argument is that the Bank knew the exact source of the funds, that the funds were earmarked to pay expected invoices from the Commonwealth Trip and that the funds were only being temporarily deposited with the Bank until the trip had to be paid for. Indeed the Debtor made clear that she would not have applied the funds to the Custom I and Custom II LOCs if she was not assured that she could draw the monies back out later. Record II at 152. The paydown of the two LOCs was not an attempt by the Debtor to deceive the Bank into believing the businesses were performing other than as represented in financial statements. Further, at the time the paydowns were made, the Bank had already extended the Custom I LOC through August, 1992. Clearly, the Bank did not and could not have relied on these paydowns when it decided to extend the Custom I LOC.

Ward testified that the Debtor told her that she liquidated the assets of Custom I and Voyage to pay the "little people", i.e., creditors other than the Bank, and that the Bank could "afford to take the hit." Record I at 149. Debtor denies having stated that the Bank would have to take the hit. Record II at 157. It is unclear the exact use that Debtor made of the available funds from the Loans. We tend to believe that Debtor did not use all the funds to pay for the Commonwealth Trip as she had told Ward she would, but rather finding herself with finite financial resources, did prefer certain creditors over the Bank. However, we do not see how her actions can be characterized as a fraud on the Bank since at the time she deposited the funds and the Bank agreed to allow the readvance, she had no intent to deceive the Bank. Moreover, it was always intended that the funds deposited would be reborrowed. Her use of the funds to pay different obligations then originally intended cannot be cause to render the Bank's debt nondischargeable under § 523(a)(2)(A).

### B.

█ The Bank next claims that the Debtor fraudulently represented that Custom II would be a subsidiary of Custom I. Record I at 25. We do not find, however, that the Bank relied upon the existence of this precise corporate structure in making the Custom II LOC. Ward did not testify that she would not have been made the loan if she knew that Custom II was not a subsidiary of Custom I. Ward testified that she knew that the Debtor was the controlling entity of Custom I, Custom II and Voyage. Record II at 33. The Bank clearly knew that the funds were to be

used to open Custom II. Record I at 26. In fact, the Bank suggested that the loan be made to Custom I, not Custom II, Record I· at 26, since it was concerned that Custom I, an existing and operating business, be the obligor on the additional line of credit rather than the start-up Custom II, not that Custom II be a subsidiary of Custom I.

Moreover, if it was critical to the Bank that Custom II be a wholly-owned subsidiary of Custom I, the Bank could have taken steps to ensure that the corporate structure was indeed put into place. The Bank did not request corporate records from either Custom I or Custom II verifying that Custom II was a subsidiary of Custom I.[7] Record I at 71, 135. The Bank argues that there was insufficient time to obtain these records. That explanation is not persuasive. The Custom II LOC was made in September, 1991. It appears that Custom II was immediately established and began operations. The Debtor and Ward discussed Custom II's operations at a luncheon meeting in March, 1992. Exhibit T–21. The Bank never inquired at that meeting into the corporate structure of Custom II. Moreover, the Bank had reason to suspect that Custom II was not a wholly-owned subsidiary of Custom I. The Debtor originally asked for a $50,000 line of credit to open Custom II. The Bank agreed to extend only $25,000 and told the Debtor that she should either inject the balance personally or get an investor. Exhibit T–11. If the Debtor got an investor to contribute the balance of the funds, it is reasonable to expect that such investor would want an ownership interest in Custom II. If the Bank had inquired further, it would have learned that Custom II was a corporation separate and independent from Custom I. At that time the Bank could have declared the Custom II LOC in default if it felt that a material covenant or representation had been breached. Exhibit T–12, ¶ Defaults (c). The Bank took none of these steps.[8] We do not find that the Bank relied upon any statement by the Debtor that Custom II would be a wholly-owned subsidiary of Custom I.

## C.

The Bank next claims that the Debtor fraudulently failed to inform Ward at their June 25, 1992 meeting that she laid herself off from Custom I in June, 1992 and began collecting unemployment. At the June 25, 1992 meeting, the Bank had before it financial statements for Custom I and Voyage which indicated that the Companies had a negative net worth. The Debtor attempted to explain away the perceived poor financial condition by contending that her accounts receivable were not reflected on the statements and that she was having problems with her bookkeeper which she was in the process of handling. This explanation apparently sufficiently assuaged the Bank's concerns and the Bank agreed to extend the Custom I LOC so that the Debtor could obtain accrual based financial statements.

The additional knowledge of the Debtor's attempt to conserve funds by laying herself off would have been inconsistent with the Debtor's attempt to assure the Bank that all was well. However, we note that Ward never stated that had she known of the layoff, she would not have extended the LOC. In any event, had she refused to extend the Custom I LOC at that point, the full amount of the loan would have been due[9] which is

---

7. Nor do the records that the Bank received, contrary to the argument made in their Post–Trial Memorandum at 7–9, suggest anything about the ownership of Custom II. They merely confirm the truth, ie. that Custom II is related to Custom I by reason of the common identity of the majority shareholder and principal officer.

8. This is not surprising since we cannot understand why it would matter to the Bank if Custom II, controlled as it was by Debtor as was Custom I, was a wholly owned subsidiary of Custom I. If the Bank wanted Custom II to stand behind the debts of Custom I, it would have sought its guaranty as it did from the Debtor. Since the Bank has not explained the significance of Custom II's stock ownership, we can only speculate how the wholly owned status would affect the Bank's position. Arguably if there is value in Custom II over its existing indebtedness and Custom I owned that equity, the Bank as a creditor of Custom I would share pro rata with other Custom I creditors in that asset. If this was the Bank's intention, we can only conclude that its strategists are the creators of rather circuitous protection.

9. The Loans were fully drawn at this time. Record I at 87–88.

the amount that ultimately became due when the Debtor closed her businesses. We have no reason to believe that the Debtor's ability to pay the Bank in June was any greater than her ability to pay in September. *See* Record II at 152. Thus, while we find that the failure to disclose the layoff was a material misrepresentation, we are unable to conclude that the Bank would have refused to extend the LOC had they been told or that the Bank was damaged as a result. Thus, all elements of a claim under § 523(a)(2)(A) have not been proven.

### D.

■ The Bank next claims that the Debtor failed to disclose that her accountant advised her in August, 1992 to close Custom I and Voyage and that she subsequently did so. We do not find this nondisclosure to be legally significant because the information was learned by the Debtor after the Custom I LOC had been extended and, therefore, the Debtor's failure to inform the Bank of this fact could not have been relied upon by the Bank.

### II.

■ *Fed.R.Civ.P. 15(b).* The Debtor argues in its Post–Trial Memorandum that this Court should not consider the Bank's request for relief under Code § 523(a)(2)(B) because the Bank failed to specifically plead that section in the Complaint. In the Complaint, the only section of the Code which the Bank plead specifically was § 523(a)(2)(A). As stated above, § 523(a)(2)(A) applies to false representations or actual fraud, other than a statement respecting the debtor's or an insider's financial condition. Section 523(a)(2)(B) applies to written statements respecting the debtor's or an insider's financial condition. The fact that the Bank did not specifically refer to § 523(a)(2)(B) in the Complaint, does not mean that we can not consider the Bank's present request for relief thereunder.

Fed.R.Civ.P. 15(b) provides for the amendment of pleadings to conform to the evidence presented at trial. Fed.R.Civ.P. 15(b) provides as follows:

> (b) Amendments to Conform to Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure to so amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice the party in maintaining the party's action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

At the trial on the Complaint, the Bank moved into evidence numerous written documents concerning the Debtor's, Custom I's and Voyage's financial condition. Bank's counsel questioned the Debtor concerning the truthfulness and accuracy of these written statements concerning her, Custom I's and Voyage's financial conditions. Debtor's counsel did not object to Bank's counsel questioning the Debtor regarding these documents, or to these documents being admitted into evidence. Debtor's counsel did not at any time argue during the trial that the Debtor would be prejudiced if questioned on these written statements regarding her, Custom I's and Voyage's financial conditions.[10] The question then becomes whether Debtor's

---

10. We note that we would not have looked favorably upon such an argument being raised by Debtor's counsel at the trial. In paragraph 15 of the Complaint, the Bank alleges that "[t]he Debtor also submitted fraudulent financial statements to the Bank in order to induce the Bank to approve" the Loans. Further, in paragraph 26 of the Complaint, the Bank alleges that the Debtor defrauded the Bank by "presenting fraudulent financial statements." Debtor's counsel was clearly on notice that fraudulent financial statements as well as false representations were in issue.

failure to object to the introduction and admission of the evidence which clearly is relevant to § 523(a)(2)(B), and which is not relevant to § 523(a)(2)(A), amounts to implied consent that issues under § 523(a)(2)(B) be tried and determined. We find that it does.

 The Third Circuit Court of Appeals has stated that under Fed.R.Civ.P. 15(b), "there is implied consent to litigate an issue if there is no objection to the introduction of evidence on the unpleaded issue, *as long as the non-objecting party was fairly apprised that the evidence went to the unpleaded issue.*" *Schultz v. Cally*, 528 F.2d 470, 474 (3d Cir.1975) (quoting *Niedland v. United States*, 338 F.2d 254, 258 (3d Cir.1964)) (emphasis in original). If the evidence went to the pleaded as well as the unpleaded issue, the non-objector could not be expected to object. As stated by the Court of Appeals, amendment under Fed.R.Civ.P. 15(b) is not accomplished "merely because evidence which is competent and material upon the issues created by the pleadings incidentally tends to prove another fact not within the issues of the case." *Id.* (quoting *Simms v. Andrews*, 118 F.2d 803, 807 (10th Cir.1941)).

Here, evidence concerning the Debtor's income tax returns and personal financial statements as well as Custom I's and Voyage's financial statements and related financial documents clearly do not make out a claim under § 523(a)(2)(A). Evidence of this nature only supports a claim under § 523(a)(2)(B). Consequently, we find that the Debtor, by not objecting to the evidence, impliedly consented to this Court's consideration of the Bank's claim under § 523(a)(2)(B).

 We note that the Bank has not filed a motion to formally amend its Complaint to conform to the evidence as permitted by Fed.R.Civ.P. 15(b). Fed.R.Civ.P. 15(b) is not permissive in its terms; it provides that is-

sues tried by express or implied consent *shall* be treated as if raised by the pleadings. The court must consider such issues. 3 J. Moore *Moore's Federal Practice* ¶ 15.13[2], at 15–134 to 135 (2d ed. 1994). Further, the Third Circuit Court of Appeals in *Cally* stated that if an issue, though never actually pleaded, is tried by express or implied consent, "the pleadings may be *deemed* amended to conform". *Cally*, 528 F.2d at 474 (citing *Niedland v. United States*, 338 F.2d 254 (3d Cir.1964)) (emphasis in original). We therefore deem the instant pleadings amended to include a claim for relief by the Bank under § 523(a)(2)(B).

### III.

 *Section 523(a)(2)(B).* Whether the Debtor's obligation under the Guaranty is excepted from discharge under Code § 523(a)(2)(B) [11] requires proof of four elements: (1) the Debtor made a written statement regarding his financial condition; (2) that was materially false; (3) upon which the creditor reasonably relied; and (4) the Debtor caused the statement to be made or published with the intent to deceive. The Bank must prove these elements by a preponderance of the evidence. *Grogan*, 498 U.S. at 287–88, 111 S.Ct. at 659–60. Again we must narrowly construe this exception to discharge against the Bank and in favor of the Debtor to preserve the Debtor's fresh start. *See supra* p. 493.

### A.

 The Bank claims that the Debtor represented that the financial statements of Custom I and Voyage were not reflective of the financial condition of the business because they were cash based, rather than accrual based, and, therefore, did not take into account the outstanding accounts receivable. This oral representation, along with

---

11. Section 523(a)(2)(B) provides as follows:

§ 523. Exceptions to discharge.
(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—
(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with the intent to deceive....

listings of accounts receivable supplied by the Debtor, allegedly led the Bank to believe that Custom I and Voyage were in better condition financially then it appeared from their financial statements. Only the falsity of the financial statements, receivable agings and any other *written* statement about the Debtor or Companies' financial condition are relevant here.

With respect to Custom I's and Voyage's financial statements, the Bank admits that these statements were true and accurate as cash based statements, Record I at 81. Because these financial statements were not false, they do not state a claim under § 523(a)(2)(B). Further, there is no evidence that the accounts receivable listings provided by the Debtor were false. In fact, Ward testified that she believed the accounts receivable listings for both Custom I and Voyage to be accurate. Record I at 73–74, 81. The accounts receivable listing, therefore, also do constitute false statements triggering a claim under § 523(a)(2)(B).

■ Another writing concerning Voyage's financial condition is a letter from Debtor on Voyage letterhead to Ward dated November 15, 1991, which states in pertinent part, "although our [Voyage's] business has been the lowest, it has been the most profitable." Exhibit T–17. We do not find that the Bank actually or reasonably relied on the foregoing statement in making the Voyage LOC. At the time the Bank received this letter, it had also received Voyage's financial statements, Exhibit T–15, which show that Voyage, as of September 30, 1991, had suffered a net loss of $64,374.72. That the Bank knew that Voyage suffered such a significant net loss on September 30, 1991, belies any argument by the Bank that it actually or reasonably relied upon the statement of profitability in the Debtor's letter. Further, the statement in Exhibit T–17 that Voyage "has been the most profitable" is stated comparatively. Most profitable compared to what? The Debtor also states in Exhibit T–17 that Voyage's business "has been the lowest." Based on the foregoing, we do not find that

the Bank actually or reasonably relied upon the statements in Exhibit T–17.

## B.

■ With respect to the Debtor's personal financial statements, we find that the Bank has met its burden with respect to the first, second, and fourth elements of § 523(a)(2)(B). The Debtor's financial statements, Exhibits T–5, T–6, T–23, are clearly written statements regarding the Debtor's financial condition. Section 523(a)(2)(B) applies to a broad class of financial statements respecting a debtor's financial condition. It is not necessary that the statement submitted by a debtor to a creditor be a formal financial statement prepared by an accountant or other professional or even that the financial statement be signed. *See Engler v. Van Steinburg (In re Van Steinburg),* 744 F.2d 1060, 1060–61 (4th Cir.1984). Here, the Debtor admitted preparing the financial statements and submitting them to the Bank.

The Debtor denies that her financial statements were false. We disagree. The financial statements submitted by the Debtor to the Bank clearly state that the Debtor's income was $70,000 to $75,000. In particular, T–6, which was submitted to the Bank in order to induce the Bank to make the Custom I LOC indicates that the Debtor's salary exclusive of bonuses and other benefits was $70,000. The financial statement at Exhibit T–23, however, submitted to the Bank in connection with the extension of the Custom I LOC in the summer of 1992, states that the Debtor receives "salary" in the amount of $47,000 and "bonuses and commissions" in the amount of $33,000 for a total of $80,000.

The Debtor's federal income tax returns tell a different story. The Debtor's 1990 income tax return shows a total income of $40,609. Exhibit T–34. The Debtor's 1991 income tax returns shows a total income of $43,811. Exhibit T–35. The Debtor's 1992 income tax return shows a total income of $25,220. Exhibit T–36. Either the information contained in the financial statements is overstated or her income reported in her tax returns is understated. Since the Debtor did not disclaim her tax returns which were filed under penalty of perjury, we conclude that

her financial statements were false.[12]

This second element, however, requires not only a showing that the financial statement contained false information, but also that the false information was material. A materially false financial statement is one that contains a "substantial or important untruth." *Hoffman & Kuhn, Inc. v. Branham (In re Branham)*, 126 B.R. 283, 290 (Bankr. S.D.Ohio 1991) (citing *Waterbury Community Federal Credit Union v. Magnusson (In re Magnusson)*, 14 B.R. 662 (Bankr.N.D.N.Y. 1981)). A finding of material falsity may be premised upon the inclusion of false information or the exclusion of information regarding the debtor's financial condition. *Armstrong Rubber Company v. Anzman (In re Anzman)*, 73 B.R. 156, 163 (Bankr.D.Colo.1986). Finally, a materially false statement is one that "paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit." *Jordan v. Southeast National Bank (In re Jordan)*, 927 F.2d 221, 224 (5th Cir.1991) (quoting *In re Nance*, 70 B.R. 318, 321 (Bankr.N.D.Tex. 1987)).[13]

We conclude that the false information about the Debtor's income was a material misrepresentation since it did paint a substantially untrue picture of her financial condition. Since the Bank was seeking an unlimited guaranty from the Debtor, the amount of her income would appear to be the type of information which would normally affect the decision to grant credit. However, we must keep in mind the source of the Debtor's income. Her income was derived from the same businesses that were obligated to the Bank on the Loans and thus did not really provide a different or additional source of repayment. Nonetheless, the Debtor's ability to take this amount of salary from the business was arguably a statement about the financial health of the businesses. And, as stated before, the fact that the Loans may still have been made had the correct salary been disclosed does not negate the materiality of the misrepresentation.

This Court is also convinced that the Bank has met its burden of proving that the Debtor made or published the financial statements with the intent to deceive the Bank.

"Direct proof of the debtor's intent to deceive is not required for a debt to be nondischargeable under § 523(a)(2)(B). Rather, intent to deceive may be inferred from the surrounding circumstances. (citation omitted) Reckless indifference or a disregard for the accuracy of a financial statement is sufficient to prove intent to deceive. (citation omitted)" *F.D.I.C. v. Reisman (In re Reisman)*, 149 B.R. 31, 37–38 (Bankr.S.D.N.Y.1993).

A finding that the debtor acted with gross reckless satisfies the element of intentional deception in § 523(a)(2)(B)(iv). *Knoxville Teachers Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir.1986). *See also Texas American Bank, Tyler, N.A. v. Barron (In re Barron)*, 126 B.R. 255, 260 (Bankr. E.D.Tex.1991) (Proof of intent to deceive does not require the demonstration that the debtor acted with a malignant heart but only

---

12. The Bank also points out the disparity between the scheduled value of her home on her financial statement dated May 14, 1992 ($250,000) and an appraised value secured some months later in preparing the Debtor's bankruptcy schedules ($170,000). Given that the first value was Debtor's estimate based upon a dated (1989) appraisal and the second the current opinion of a real estate broker, and recognizing that values may diverge significantly based on the appraisal source and the type of sale contemplated, i.e., forced sale vs. regular market sale, we do not conclude that Debtor has misrepresented the value of that asset. Neither do we find the wide swing in the value of her interest in the stock of her Companies evidence a fraudulent misrepresentation by the Debtor. The Bank had the best information available concerning the value of the Debtor's equity in her Companies. Since we have found that this information was not fraudulent, we cannot conclude that the Debtor defrauded the Bank about the value of her interests.

13. While it is true that materiality is established by evidence that a loan would not have been made but for the false writing, the converse (i.e., the loan would have been made regardless of the false writing) does not refute materiality. *Jordan*, 927 F.2d at 224 (quoting *In re Bogstad*, 779 F.2d 370, 375 (7th Cir.1985)) ("[I]n determining whether a false statement is material, a relevant *although not dispositive inquiry* is 'whether the lender would have made the loan had he known the debtor's true situation.' ") (emphasis added).

that the debtor's actions demonstrate reckless indifference to the actual facts.) Since few debtors will admit to a deceitful intent, all facts, including circumstantial evidence may be relied upon in making the determination as to intent. *Devers v. Bank of Sheridan (In re Devers)*, 759 F.2d 751, 754 (9th Cir.1985).

Here, the Debtor, an experienced businesswoman, acted, at a minimum, with reckless indifference to the actual facts when she submitted the financial statements, T–5 and T–6, for the Bank's consideration. Debtor certainly knew that the Bank required this financial information in making its credit decision regarding the Loans. The Debtor knew or should have known that her financial statements and her income tax returns contained conflicting information. Accordingly, this Court finds that the Debtor submitted the financial statements to the Bank knowing they was false, or at least acting with reckless indifference as to the truth of the information therein, with the intent to deceive the Bank.

■ Finally, there can be no dispute as to whether the financial statements were "published" as required by § 523(a)(2)(B)(iv). A writing is published under this subsection if it is "either written by the debtor, signed by the debtor, *or* adopted and used by the debtor". *Landmark Leasing Incorporated v. Martz (In re Martz)*, 88 B.R. 663, 671 (Bankr.E.D.Pa.1988) (emphasis in original). The financial statements were signed by the Debtor.

■ These findings by the Court are not sufficient, however, to deny Debtor her discharge since the Bank must prove each element of § 523(a)(2)(B) to prevail and it failed to establish the third element, i.e., it actually relied upon the false information in the financial statements in deciding to make the Loans. *Martz*, 88 B.R. at 673. *See also IH Mississippi Valley Credit Union v. O'Connor (In re O'Connor)*, 149 B.R. 802, 809 (Bankr. E.D.Va.1993).

■ Actual reliance is a subjective test that requires a creditor to show that its reliance on a false financial statement was "a contributory cause of the extension of credit" and that credit would not have been granted if the lender had received accurate information. *Anzman*, 73 B.R. at 164 (quoting *In re Coughlin*, 27 B.R. 632, 637 (1st Cir. BAP 1983)). *See also In re Nance*, 70 B.R. 318, 323 (Bankr.N.D.Tex.1987) (quoting *In re Mutschler*, 45 B.R. 482, 492 (Bankr.D.N.D. 1984)) (Reliance need not be absolute or the sole factor but rather need only be the "precipitant; the catalyst for the loan, without which the loan would not have been made.")

■ Here, Ward testified that if she had known the true salary the Debtor was receiving, it would have impacted her decisions. Record I at 66. In response to a direct question of whether she would have renewed the Custom I lines of credit year after year had she known the Debtor's true income, Ward responded that the first things she would have done "is question [the Debtor] as to why she filled in her financial statements a significantly different figure." Record I at 67. Ward further stated that "[p]robably that alone would have caused me to discuss with her the differentials and it probably would have had an impact on the fact of me renewing the lines." *Id.* Ward conspicuously failed to testify that she would not have renewed the Custom I LOC or made the Custom II LOC or the Voyage LOC had she known the Debtor's true income. As in the *Martz* case, this Court finds the Bank's evidence regarding reliance to be equivocal at best. *Martz*, 88 B.R. at 673.

Moreover, the Bank knew when it received the Debtor's personal financial statement in 1992, Exhibit T–23, that her income was substantially less than had been previously reported in 1990 and 1991. Specifically, on the later financial statement the Debtor divided her income into two categories, salary, $47,000 [14] and benefits, $33,000. Notwithstanding this substantially lower figure for salary, the Bank without questioning the Debtor on the disparity between that infor-

---

**14.** We note that Debtor's income tax statement reported a salary for 1992 of $25,220. The Debtor explained this difference by stating that the salary reported on T–23 was an estimate for the year 1992 while the salary reported on the income tax return was an actual figure.

mation and prior financial statements which disclosed a salary of $70,000–$80,000 nonetheless extended the Custom II LOC through August, 1992. This belies the Bank's argument that it might not have made the Loans or extended the Custom II LOC if it had known that the Debtor's salary was less than $70,000.

Accordingly, the Bank has failed to establish each of the elements of § 523(a)(2)(B) so as to preclude the dischargeability of the Bank's claim under this section of the Code as well.

An Order consistent with the foregoing Opinion will be entered.

### ORDER

**AND NOW,** this 3rd day of October, 1994, upon consideration of the Complaint filed by Frankford Bank a/k/a Frankford Trust Company (the "Bank") under 11 U.S.C. § 523(a)(2) and the record of the trial of this matter and the parties' post-trial submissions and for the reasons stated in the accompanying Opinion, it is hereby **ORDERED** that judgment is entered in favor of defendant and against plaintiff and the debt owed by defendant to plaintiff is **DISCHARGEABLE.**